UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Jane Doe, | ) | No. 2:24-cv-1682-RMG-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| Weston & Sampson Engineers, Inc., | ) | |
| Jason Roberts, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on cross-motions regarding Plaintiff's use of a pseudonym filed by Plaintiff, ECF No. 30, and Defendant Jason Roberts ("Roberts"), ECF No. 17.[1]  Pursuant to the provisions of 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B), D.S.C., the undersigned United States Magistrate Judge is authorized to review all pretrial matters in this case.  For the reasons below, Plaintiff's motion is denied, and Roberts' motion is granted.

## BACKGROUND

### Procedural History

Plaintiff, using the pseudonym "Jane Doe," commenced this action on April 3, 2024, by filing a Complaint against her former employer, W&S, and former co-worker, Roberts, alleging various state law claims as well as claims for discrimination and retaliation under Title VII of the Civil Rights Act of 1964.  ECF No. 1.  Plaintiff filed an Amended Complaint on July 26, 2024.[2] ECF No. 38.

---

[1] Defendant Weston & Sampson Engineers, Inc. ("W&S") does not appear to take a position on Plaintiff's use of a pseudonym, as it has not filed any motions or briefs on the issue.

[2] In response to the original Complaint, W&S filed a motion to dismiss for failure to state a claim.  ECF No. 7.  Roberts also filed a motion to dismiss for failure to state a claim and an

On June 7, 2024, Roberts filed a motion to compel Plaintiff to proceed without using a pseudonym.  ECF No. 17.  Plaintiff filed a response in opposition on June 21, 2024, and Roberts filed a reply on June 26, 2024.  ECF Nos. 23; 25.  On July 1, 2024, Plaintiff filed a motion to proceed under a pseudonym pursuant to Rule 10(a) of the Federal Rules of Civil Procedure.  ECF No. 30.  Roberts filed a response in opposition on July 11, 2024.  ECF No. 32.  By Order dated July 16, 2024, the Court instructed the parties to provide additional briefing and documentation under seal regarding these two motions to address a purported Facebook post made by Plaintiff.  ECF No. 36.  Roberts filed his response on July 18, 2024, ECF No. 37; Plaintiff filed her response on July 28, 2024, ECF No. 39; and Roberts filed a reply on July 30, 2024, ECF No. 40.  The motions are fully briefed and ripe for review.

## Factual Background

By way of background, the Court provides only a summary of the pertinent allegations and claims asserted in the Amended Complaint as they pertain to the matters addressed in the pending motions.  ECF No. 38.  During the times relevant to the events at issue in this case, Plaintiff and Roberts were both employed by W&S in its North Charleston, South Carolina office.  *Id*. at 2, ¶¶ 3, 6.  At that time, Plaintiff was a 22-year-old female and Roberts was a male over the age of 40.  *Id*. at 1–2, ¶¶ 2, 7.

Soon after Plaintiff began her employment with W&S, Plaintiff and Roberts attended a conference in Florida with another co-worker.  *Id*. at 6, ¶¶ 31, 34–35.  At the conference, Roberts

---

Answer and Counterclaim.  ECF Nos. 15; 16.  Plaintiff filed a motion to amend/correct the Complaint on June 12, 2024, and an Answer to Roberts' Counterclaim on June 28, 2024.  ECF Nos. 19; 29.  The parties then filed various briefs in support of and/or in opposition to these various motions.  *See* ECF Nos. 18, 20, 22, 24, 26, 27, and 31.  By Order dated July 16, 2024, the undersigned granted Plaintiff's motion to amend and mooted Defendants' motions without prejudice.  ECF No. 34.  Plaintiff then filed an Amended Complaint on July 26, 2024.  ECF No. 38.

"drank alcohol excessively and started to try to make dates with some of the women seated around him." *Id*. at 7, ¶ 39. Plaintiff wanted to network at the conference and attempted to avoid Roberts. *Id*. at 8, ¶ 40. Roberts made unwanted advances to Plaintiff. *Id*. at 8, ¶ 41. Feeling embarrassed by Roberts' behavior, Plaintiff attempted to take Roberts to his room, but he could not identify the proper room. *Id*. at 8, ¶¶ 42–43. Roberts threatened to retaliate against Plaintiff if she told anyone about his drinking, and she became nervous and panicky. *Id*. at 8, ¶ 44. "In her panicked state, Plaintiff took Roberts to her own room, where he passed out." *Id*. at 8, ¶ 45. When Roberts awoke, he "attacked Plaintiff sexually and without her consent." *Id*. at 8, ¶ 47. Plaintiff told Roberts to stop multiple times, but he persisted. *Id*. Roberts strangled Plaintiff, threatened her life, bit her forcefully, and threatened Plaintiff not to tell anyone. *Id*. at 8, ¶¶ 48, 50.

Following this incident, Plaintiff was unable to change her flight and return home as she lacked access to funds, and so she participated in the second day of the conference. *Id*. at 8, ¶ 51. Roberts consumed alcohol on the second day of the conference and began stalking and harassing Plaintiff. *Id*. at 9, ¶ 52. After the conference ended, Roberts and Plaintiff were on the same flight home but, due to bad weather, Plaintiff missed her connecting flight. *Id*. at 9, ¶ 53. Because no flights were available, "Roberts stated he had his truck in the parking lot and promised he would just drive Plaintiff from the airport to a hotel where she would have her own room." *Id*. Once in his truck, Roberts forced Plaintiff to drive by threatening her with a gun that was in his truck. *Id*. at 9, ¶ 54. Upon arriving at the hotel, Roberts, still in possession of his firearm, forced Plaintiff to stay in his room where he sexually assaulted her and prevented her from leaving. *Id*. at 9, ¶ 55.

Plaintiff subsequently sought medical attention for her injuries and reported Roberts' actions to law enforcement and to her employer. *Id*. at 9, ¶¶ 57–58. Roberts was terminated from employment with W&S for excessive drinking at the conference. *Id*. at 10, ¶ 64. Plaintiff

eventually resigned from her employment with W&S. *Id*. at 11, ¶ 71. Plaintiff makes other allegations concerning these and other events.

Based on these allegations, Plaintiff asserts the following claims: civil assault and battery against Roberts, *id*. at 13–14, ¶¶ 83–87; Title VII retaliation against W&S, *id*. at 14–16, ¶¶ 88–98; Title VII claims, including discrimination and hostile work environment, against W&S, *id*. at 16–17, ¶¶ 99–108; intentional infliction of emotional distress against both Defendants, *id*. at 17–18, ¶¶ 109–113; defamation against both Defendants, *id*. at 18–21, ¶¶ 114–129; and tortious interference with contract against Roberts, *id*. at 21–22, ¶¶ 130–139.

## APPLICABLE LAW

Rule 10(a) of the Federal Rules of Civil Procedure requires that a civil complaint "must name all the parties." Fed. R. Civ. P. 10(a). "That requirement is more than mere formality," *Doe v. Liberty Univ., Inc.*, No. 6:21-cv-00059, 2022 WL 4781727, at *3–4 (W.D. Va. Sept. 30, 2022), as it "serves the vital purpose of facilitating public scrutiny of judicial proceedings and therefore cannot be set aside lightly," *B.R. v. F.C.S.B.*, 17 F.4th 485, 496 (4th Cir. 2021). This "general presumption" ensures open judicial proceedings, *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993), and protects the public's "interest in knowing the names of litigants," *Doe v. Pub. Citizen*, 749 F.3d 246, 274 (4th Cir. 2014). To protect these interests, "few cases warrant anonymity" and "few litigants request it." *Doe v. Sidar*, 93 F.4th 241, 247 (4th Cir. 2024).

Moreover, the Court must be cognizant of the "general presumption of openness of judicial proceedings," though that "operates only as a presumption" and "under appropriate circumstances anonymity may, as a matter of discretion, be permitted." *James*, 6 F.3d at 238 (noting, however, that allowing a litigant to proceed anonymously is a "rare dispensation"). Because litigation under a pseudonym "undermines the public's right of access to judicial proceedings," the Fourth Circuit

has held that, "when a party seeks to litigate under a pseudonym, a district court has an independent obligation to ensure that extraordinary circumstances support such a request by balancing the party's stated interest in anonymity against the public's interest in openness and any prejudice that anonymity would pose to the opposing party." *Public Citizen*, 749 F.3d at 273–74.

Thus, a district court may allow pseudonymous litigation only in "exceptional" circumstances. *Id.* at 273; *see also James*, 6 F.3d at 238. In *James*, the Fourth Circuit identified five non-exhaustive factors to consider when a party requests to proceed pseudonymously:

(1)    whether the requesting party requests pseudonymity to avoid the annoyance and criticism that often accompanies litigation *or* to preserve privacy in a matter of sensitive and highly personal nature;

(2)    whether identification poses a risk of retaliatory physical or mental harm to the requesting party or to innocent third parties;

(3)    the ages of the protected parties;

(4)    whether the action is against a governmental or private party; and

(5)    whether proceeding pseudonymously is unfair to the opposing party.

6 F.3d at 238; *see also Doe v. Doe*, 85 F.4th 206, 211 (4th Cir. 2023) (reaffirming and applying the *James* factors); *Sidar*, 93 F.4th at 247 (same). Some of these factors may not be relevant in a particular case, while others may be. *Doe v. Va. Polytechnic Inst. & State Univ.*, No. 7:19-cv-249, 2020 WL 1287960, at *3 (W.D. Va. Mar. 18, 2020). No single factor is dispositive. *See Doe*, 85 F.4th at 212 (requiring district courts to "consider each case individually" and "discern which factors should—in their discretion—weigh most heavily"). Instead, the district court must find the requesting party's stated interest in anonymity outweighs the public's interest in openness and any prejudice anonymity would pose to the opposing party. *Pub. Citizen*, 749 F.3d at 274.

5

## DISCUSSION

### The Parties' Positions

Roberts filed a motion to compel Plaintiff to proceed without using a pseudonym and to amend her Complaint to reflect her name. ECF No. 17. Roberts' primary contention in his motion is that Plaintiff is proceeding anonymously in this action without seeking prior authorization from the Court, despite the usual rule that all parties to an action must be identified. ECF No. 17-1 at 4. In her response, Plaintiff emphasizes that she "is a sexual assault victim" and seeks to protect her privacy. ECF No. 23 at 1. Plaintiff acknowledges that she did not comply with Rule 10(a) and "seeks permission at this time to rectify the error." *Id*. at 2. The crux of Plaintiff's argument is that her privacy should be protected as this case "involves a sexual assault victim who has suffered severe mental health consequences and has received intense treatment since the incident." *Id*. at 5. Plaintiff contends that, when viewed together, the *James* factors weigh in favor of proceeding anonymously, particularly given "a significant risk to [her] of escalated and continued retaliation which may occur if her identify were published." *Id*. at 6. Roberts, on the other hand, argues in response that "[t]he balance of interests at stake weigh against granting Plaintiff's motion to proceed under a pseudonym under the circumstances of this case," noting that "Plaintiff has used her own name in a posting to a Facebook group where she claimed that Roberts sexually assaulted her." ECF No. 25 at 2, 4. As such, Roberts argues, "Plaintiff has not acted to preserve her privacy," and the *James* factors each weigh against permitting Plaintiff to proceed anonymously. *Id*. at 5.

As noted, Plaintiff filed her own motion, albeit belatedly, seeking permission from the Court to proceed using a pseudonym under Rule 10(a). ECF No. 30. Plaintiff's memorandum in support goes into greater detail concerning her arguments, but she still emphasizes as her primary argument that she "is a sexual assault victim" and is thus entitled to protect her privacy given the

serious nature of her allegations.  ECF No. 30-1 at 1.  Roberts opposes Plaintiff's motion and reiterates his prior arguments, relying on the *James* factors and arguing that they "weigh against allowing Plaintiff to proceed anonymously."  ECF No. 32 at 3.

## Analysis

The Court will apply each of the *James* factors in turn to the specific facts and circumstances of this case.[3]  The first factor requires the Court to consider whether Plaintiff's request for pseudonymity is made to avoid the annoyance and criticism that often accompanies litigation, *or* to preserve privacy in a matter of sensitive and highly personal nature.  At first blush, this factor appears to weigh in favor of permitting Plaintiff to proceed anonymously.  Plaintiff has alleged that Roberts sexually assaulted her, and she desires to protect her privacy in a matter that is sensitive and highly personal.  "Numerous district courts have recognized a plaintiff's interest in preserving privacy where the allegations concern sexual assault."  *Doe v. Doe*, 649 F. Supp. 3d 136, 139 (E.D.N.C.) (collecting cases), *aff'd*, 85 F.4th 206 (4th Cir. 2023).  And "[t]he Fourth Circuit has recognized particular sensitivity in cases where the allegations involve 'intimate

---

[3] As noted, Plaintiff commenced this action using a pseudonym without first obtaining permission from this Court under Rule 10(a).  "While the Fourth Circuit Court of Appeals has not ruled on this issue, some courts have held that, absent permission to proceed anonymously, if a complaint fails to comply with Rule 10(a) and does not divulge the plaintiff's identity, its filing is ineffective to commence an action and the court lacks jurisdiction over the unnamed parties." *Richard S. v. Sebelius*, No. 3:12-cv-007-TMC, 2012 WL 1909344, at *1 (D.S.C. May 25, 2012) (denying "Plaintiffs' belated request to proceed anonymously") (citations omitted).  "The court does not condone the filing of an action anonymously without permission . . . [and, w]ithout identification of Plaintiffs or permission from the court to proceed anonymously or under a pseudonym, the court may lack jurisdiction and, furthermore, the burden should not fall on Defendants to request identification of Plaintiffs."  *Id*.  However, despite Plaintiff's initial failure to comply with Rule 10(a), she has now moved to proceed pseudonymously and the parties have fully briefed the issue.  The Court need not address Plaintiff's failure at the outset of this case to seek permission to proceed pseudonymously, as the issue is now ripe for disposition and the case is in the early stages of litigation.  Even so, the Court reaffirms that Plaintiff's Complaint should have been accompanied by an appropriate request under Rule 10(a) to proceed using a pseudonym.

details' of 'sexual assault' and the resultant trauma, and has noted that victims of such conduct have an 'interest in preserving privacy.'" *Doe v. Darden Restaurants*, *Inc.*, -- F. Supp. 3d --, No. JKB-24-cv-1368, 2024 WL 2881121, at *2 (D. Md. June 7, 2024) (quoting *Sidar*, 93 F.4th at 248).

However, where a Plaintiff has not herself acted in a manner to preserve her privacy as to her allegations of sexual assault, this interest may be negated. That a claim involves "matters of a sensitive and personal privacy matter" alone is not dispositive, as "courts have generally been reluctant to provide anonymity based on a plaintiff's fear of embarrassment over the revelation of personal matters," particularly where other factors weigh against anonymity. *Richard S. v. Sebelius*, No. 3:12-cv-007-TMC, 2012 WL 1909344, at *2 (D.S.C. May 25, 2012). Roberts argues that other factors weigh against Plaintiff's request for anonymity here, as Plaintiff herself "has not acted to preserve her privacy" because she used her own name and photograph on social media in claiming that Roberts sexually assaulted her, thus unmasking her identity in a public forum. ECF No. 25 at 4. Roberts argues that "[b]ecause Plaintiff's reasons for anonymity (to preserve her privacy) are belied by her [own] actions, this factor weighs against anonymity." *Id.* at 5. The Court is constrained to agree.

In response to this Court's Order dated July 16, 2024, the parties filed briefs and documents under seal on this issue. *See* ECF Nos. 36; 37; 39; 40. Based on a review of the parties' submissions regarding Plaintiff's Facebook posts, the Court concludes as follows.[4] "Are We

---

[4] The United States Court of Appeals for the Second Circuit has provided the following explanation for "How Facebook Works":

> Facebook operates an "online social network platform and communications service[]." Facebook users populate their own "Facebook 'pages'" with "content," including personal identifying information and indications of their particular "interests." Organizations and other entities may also have Facebook pages. Users can post content on others' Facebook pages, reshare each

Dating the Same Guy?" ("AWDTSG") is a network of approximately 200 female-only Facebook groups that are location-specific.[5]  ECF No. 37 at 1.  Within these groups, women can post

> other's content, and send messages to one another.  The content can be text-based messages and statements, photos, web links, or other information.
>
> Facebook users must first register for a Facebook account, providing their names, telephone numbers, and email addresses.  When registering, users do not specify the nature of the content they intend to publish on the platform, nor does Facebook screen new users based on its expectation of what content they will share with other Facebook users.  There is no charge to prospective users for joining Facebook.
>
> Facebook does not preview or edit the content that its users post.
>
> Facebook's terms of service specify that a user "own[s] all of the content and information [the user] post[s] on Facebook, and [the user] can control how it is shared through [the user's] privacy and application settings."

*Force v. Facebook, Inc.*, 934 F.3d 53, 58–59 (2d Cir. 2019) (citations and footnotes omitted) (alterations in original).

[5] One court has provided the following explanation regarding Facebook groups:

> Facebook allows users to create and join two different types of groups: private and public.  In private groups, only members can see the identity of other group members and what they post within the group.  Once a private group is created, the group administrators cannot change the group to "public."  The only change the administrators can make is to allow the group to be searchable by non-members (i.e., visible) or not (i.e., hidden).  Members of a private Facebook group can access the names of all the other members within the group, and they can also see when the number of members increases or decreases.

*Davis v. HDR Inc.*, 652 F. Supp. 3d 1087, 1091 (D. Ariz. 2023) (citations omitted), *appeal dismissed,* No. 23-15233, 2023 WL 5367499 (9th Cir. May 10, 2023).

screenshots of men's dating profiles to their specific location's group, asking other members of the group for "red flags" or "tea" (apparently referring to gossip or information) about the identified men. *Id.*; *see also* ECF No. 37-1 (screenshot of Greenville/Anderson Group explaining in an "About this group" section that "[t]his group is a place for women to protect, support, and empower other women. A place where woman [sic] can speak freely, openly, and honestly . . ."). Although there are more than 200 AWDTSG groups, each group is geographically based, and the groups "do not link to each other." ECF No. 39 at 2 (explaining that "[a] participant in a New York City group cannot see posts from a group in Miami"). To join a group, a member must be vetted and only individuals (presumably female) who have been admitted to the group are able to see the content posted by other members and to post content themselves. ECF No. 39 at 2. The rules applicable to these groups prohibit taking screen shots of content and sharing the information outside of the group.[6] ECF No. 39 at 2.

The parties have identified two AWDTSG groups in which Plaintiff was a member and posted information about the issues involved in this case. *See* ECF No. 39 at 2 (Plaintiff explaining she "joined [two] closed Facebook groups dedicated to protecting women" and conceding she posted content in these groups). First, there is a regional group for Greenville and Anderson Counties, which has approximately 16,700 members (the "Greenville/Anderson Group"). ECF Nos. 37 at 1–2 (incorrectly stating the group has approximately 6,700 members); 37-1 at 1 (Greenville/Anderson Group landing page noting the group has approximately 16,700 members); 40 (Roberts' reply noting his initial filing contained a typographical error and that "[t]here are actually 16,700 members"); 39 at 2–3. Second, there is a regional group for the Charleston and

---

[6] Plaintiff has provided a copy of the "rules" applicable to both AWDTSG groups at issue here. *See* ECF Nos. 39-1; 39-2.

Columbia areas (the "Charleston/Columbia Group") with over 40,000 members. *See* ECF Nos. 39 at 2; 40 at 1; *see also* https://www.facebook.com/groups/517463483387445/ (last visited July 31, 2024) (Charleston/Columbia Group public landing page, noting the group consists of approximately 44,500 members).

In June or July 2023, a member of one of the two groups posted a request seeking information about Roberts.[7]   ECF Nos. 37 at 2; 37-1 at 1–3.  Plaintiff, using her full name and profile picture, responded to this post as follows:

> To everyone, he SA me.  I didn't know he had a criminal history.
> I'm putting this out there to protect anyone I can from him.  He is
> DANGEROUS.

ECF Nos. 37 at 2; 37-3 at 1.  Although members of AWDTSG have the option to post anonymously, Plaintiff posted this comment using her real name along with a photograph.  ECF No. 37 at 2; 37-3 at 1.  Moreover, Plaintiff's post was linked to her personal Facebook profile, which contained additional pictures and personal information.  ECF Nos. 37 at 2; 37-4.  Plaintiff acknowledges that she posted the information quoted above using her name, but contends she did not intentionally disclose her identity and later removed the post and ceased involvement in the Charleston/Columbia Group to preserve her privacy.  ECF No. 39 at 4.  However, in light of the foregoing, the Court finds that by using her own name in a post to a Facebook group consisting of over 40,000 individuals where she claimed that Roberts sexually assaulted her, Plaintiff has not acted to preserve her privacy in this matter, which weighs against allowing her to proceed

---

[7] Roberts has provided a screenshot of Plaintiff's post.  ECF No. 37-3 at 1.  He appears to argue that Plaintiff posted the content to the Greenville/Anderson Group.  ECF No. 37 at 1–2. Plaintiff clarifies that the screenshot is actually a post in the Charleston/Columbia Group, ECF No. 39 at 4, but acknowledges she was a member of both groups, *id*. at 1.  Whether Plaintiff posted the comment quoted above in both groups or just one is immaterial to the ultimate conclusion reached by the Court.  Indeed, Plaintiff's concession that she posted in the Charleston/Columbia Group only bolster's the Court's conclusion, as that group is comprised of over 40,000 members.

anonymously in this case under the first *James* factor.  Plaintiff unmasked herself and published

information about her sexual assault to at least 40,000 individuals, any one of whom could have

then republished that information outside of the Facebook group where Plaintiff initially disclosed

the information.

Plaintiff's argument that she did not *intentionally* disclose her identity, ECF No. 30-1 at 7,

is also not credible.  Plaintiff acknowledges that she used her own name and profile picture in

making her post, even though the Greenville/Anderson Group, for example, contains a notice

advising members as follows:

> We do our best to keep this space as safe as we can, but we can't
> guarantee that something said in the group won't be leaked by
> another member.  Please be mentally prepared for the possibility that
> things you say here may get back to who you wrote about.  We
> suggest posting anonymously as well as making the details of your
> story vague enough to not trace back to you.

ECF Nos. 37-1 at 2.  Indeed, the "rules" for both groups include multiple notices and warnings

about posting anonymously and the risks associated with sharing information.  *See, e.g.*, ECF No.

39-2 at 5 (rules for the Charleston/Columbia Group explaining, "we can't guarantee that something

said in the group won't be leaked by another member. . . .  We suggest posting anonymously as

well as making the details of your story vague enough to not trace back to you.").  If Plaintiff

wished to post anonymously, there is no evidence that she could not have done so.  But she did not

post anonymously.  And, despite Plaintiff's argument that the information posted within the

AWDTSG groups is not supposed to be shared, both groups provided multiple warnings that

information could be shared or leaked to individuals outside of the groups.

Additionally, even if not shared outside of the group, Plaintiff knew, or should have known,

that the information she posted was nonetheless still visible to at least 40,000 individuals and

possibly as many as 60,000.  Most of those individuals were likely complete strangers to Plaintiff,

and there is no evidence that Plaintiff attempted to conceal her identify from these tens of thousands of individuals. To the contrary, Plaintiff's post (using her own name and with a profile picture) was addressed "[t]o *everyone*" and asserted "I'm putting this out there to protect *anyone* I can." ECF No. 37-3 at 1 (emphasis added). Plaintiff's blanket address to everyone and anyone demonstrates a deliberate attempt on her part to widely publicize the information she was posting. Indeed, Plaintiff took ownership of the post, expressing "I'm putting this out there," evidencing a conscious determination to share the information to her large audience.

Plaintiff argues that the "post should not vitiate her right to continued privacy" as "[s]he did not post her information on a public bill board, on a publicly viewable internet site, in the newspaper or on TV." ECF No. 49 at 2. Instead, she contends, her post was made to "closed Facebook groups dedicated to protecting women." *Id*. However, Plaintiff's insistence that the post was made to a "closed" or "private" group that was not viewable by the general public is without merit. As an initial matter, the Court reiterates that the post was visible to at least 40,000 individuals, most of whom were no doubt complete strangers to Plaintiff. Even so, she specifically addressed the post to "everyone." And, despite the "closed" or "private" designation of the groups, Plaintiff should have known (especially given the warnings and notices in the rules governing the groups) that once the information was published, she had no control over how that information could be republished or disseminated beyond the four walls of those groups or to whom. And while the number of members who can access the information may not be dispositive, it is at least relevant that Plaintiff purposefully posted her content to a group with over 40,000 members. *See, e.g., Margolies v. Rudolph*, No. 21-cv-2447-SJB, 2022 WL 2062460, at *7 (E.D.N.Y. June 6, 2022) (concluding that a private Facebook group with over 14,000 members "has the character of 'a place open to the public,' because it has no meaningful barriers to entry—to join one need only

13

agree to the rules of the group—and its members appear to be free to speak online about any subject openly").

Further, although the Court is unable to find any case law directly addressing this issue (i.e., whether a social media post in a closed Facebook group constitutes publication of private information to the public thus contradicting the poster's privacy concerns), the following cases are instructive.[8]  First, in evaluating the reach of First Amendment speech rights, the Supreme Court has suggested that "'social media' sites are the 21st century equivalent of public streets and parks." *Packingham v. North Carolina*, 582 U.S. 98, 118 (2017) (Alito, J., concurring) (footnote omitted).

---

[8] State and federal courts have wrestled with defining the legal contours of social media sites in various contexts, including First Amendment speech, Fourth Amendment searches, discovery disputes, claims for defamation and invasion of privacy, disseminating trade secrets, FOIA requests, government wiretapping, and matters arising under civil rights statutes.  While the applicable legal standards in these various types of situations might differ and are context specific, a common reality can be distilled—individuals posting content on social media sites have little, if any, expectation of privacy such that information posted on social media sites is "private" and can be sealed from the public view or that the information cannot be considered a matter of public importance.  A recent New York state court decision evaluating the reach of New York's anti-SLAPP statute to a post in a "private" Facebook group explained:

> Here, the plaintiff argues that [an individual's] comments were posted to a Facebook group designated as "private" by Facebook and are not connected to an issue of public interest.  This Court disagrees.  "Private" in the context of the Civil Rights Law is not the same as "private" as nomenclature used by the programmers who maintain Facebook.  The fact that a Facebook group vets potential group members to ensure that individuals are earnest in their desire to engage with the public discourse being conducted and to help protect and empower the individuals participating does not render the group private and removed from the sphere of public interest.  Therefore, this Court concludes that the Facebook group was a public forum for purposes of New York's anti-SLAPP statute.  Moreover, examining the content, form, and context of the statements, it is clear to this Court that the posts on Facebook are a matter of public concern for purposes of New York's anti-SLAPP statute.

*Acosta v. Vann*, 83 Misc. 3d 1217(A), 212 N.Y.S.3d 550 (N.Y. Sup. Ct. 2024).

Indeed, social media sites are now regarded as spaces for public discourse, and information posted publicly to social media sites cannot reasonably be expected to be considered private.[9]  *See, e.g.*, *Davison v. Randall*, 912 F.3d 666, 682 (4th Cir. 2019), *as amended* (Jan. 9, 2019) (explaining governmental social media sites "bear the hallmarks of a public forum" by constituting a space for unfettered "public discourse").  This is true even for "closed" or "private" Facebook groups.  *See, e.g., Davis v. HDR Inc.*, 652 F. Supp. 3d 1087, 1097 (D. Ariz. 2023) ("Plaintiff has failed to plausibly allege that her electronic communications posted into the private Facebook groups were not readily accessible by the general public."), *appeal dismissed*, No. 23-15233, 2023 WL 5367499 (9th Cir. May 10, 2023).  Indeed, the stated purpose for the AWDTSG groups at issue here is to provide a safe space for women to "speak freely, openly, and honestly."  ECF No. 39-1 at 11. Although membership is restricted and the groups are designated as "closed" or "private," AWDTSG groups are nevertheless public spaces designed for "free" and "open" discussions.

The Court's conclusion that AWDTSG groups are public spaces is also based on the following considerations.  First, although access to the AWDTSG groups is restricted to members who must undergo a "screening process," it is not Plaintiff who conducts that screening process. The groups' moderators or administrators control the vetting process for membership and, as far as the Court can discern, the only requirements to be admitted are to demonstrate that a prospective member is a female, a real person, and a Facebook user.  *See, e.g.*, ECF No. 39-2 at 6.  As such, anyone who meets these criteria can become a member and gain access to the information posted

---

[9] Of course, the claims in the present case do not involve First Amendment concerns, nor does the designation of "public forum" under First Amendment jurisprudence as used in the cases cited above have any special impact on the issues in this case.  Instead, these cases are cited because they recognize that social media sites are ***public spaces***, akin to public streets and parks.  This reality directly cuts against Plaintiff's argument that she did not unmask her privacy to the public because "[s]he did not post her information on a public bill board, on a publicly viewable internet site, in the newspaper or on TV."  ECF No. 49 at 2.

in the groups.  There is no evidence that Plaintiff is a moderator or administrator or that she has any control over the membership of the AWDTSG groups.  Because Plaintiff is unable to control the membership of the groups, she cannot control who has access to the information she posts in the groups.  As such, Plaintiff cannot plausibly restrict the privacy of the content she posts within those groups.[10]  Hence the groups' recommendations that users post anonymously.

Similarly, although the AWDTSG groups appear at present to be designated "closed" or "private," there is no evidence that Plaintiff can control those limitations.  Indeed, it appears that the moderators and administrators of the group could open membership to anyone who wishes to join or curtail the membership criteria.  Likewise, although the "private" designation of these groups indicates some level of intended privacy whose content is restricted only to members, there is no guarantee, contract, or agreement among the members that the content posted within the groups will not be shared elsewhere.  Although the rules forbid sharing information outside the group, there is no evidence of any safeguards (other than the threat of expulsion from the group) preventing anyone from doing so.

Accordingly, despite Plaintiff's attempt to characterize the Facebook groups as private, they are nonetheless "public" spaces for the issue at hand.  Although members of the Facebook groups must be vetted and the groups are not open to everyone, they are comprised of thousands of individuals in the communities where the parties live and work.  And, as a social media platform with posts available to thousands of individuals, most of whom are no doubt complete strangers to

---

[10] Posting information in a Facebook group created and controlled by others is categorically different than posting information on one's private Facebook "wall" or even in a group created and controlled by that individual.  Plaintiff posted her information in a group created and controlled by other individuals with that group having a large membership base that was controlled by those other individuals and not the Plaintiff and with rules moderated by those other individuals and not by Plaintiff.

the parties, Plaintiff cannot reasonably argue that she had an expectation that her posts were "private" or that they would remain unpublished to anyone outside the Facebook group. Indeed, while the Facebook groups' "rules and regulations" prohibit members from taking screenshots or sharing posts, there do not appear to be any measures in place to prevent a member of the group from publishing information posted in the group to anyone outside of the group.[11] The very fact that Roberts was able to obtain screenshots of Plaintiff's posts demonstrates that information shared within the groups is not truly "private."[12]

Having concluded that the first factor discussed above weighs against Plaintiff's request to proceed anonymously, the Court turns to the remaining factors, which also weigh against Plaintiff's request or at least are neutral. The second factor requires the Court to consider whether identification of Plaintiff poses a risk of retaliatory physical or mental harm, and the Court is mindful that accusations of sexual assault "can invite harassment and ridicule." *Doe v. The Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 593 (E.D. Va. 2016). Plaintiff contends

---

[11] The Court notes that these findings are not meant to diminish the utility of such a group. To be sure, victims of sexual assault can benefit from support groups designed to assist in recovery from the trauma they experienced. That said, a Facebook group designed to share "tea" and "red flags" pertaining to potential dating partners is not the same as a support group for survivors of sexual assault. Plaintiff's lack of discretion in publishing information under her own name about her sexual assault to a large group of individuals in a group that promotes sharing "tea" and "red flags" on potential dating partners without the ability to limit the republication of such information to individuals outside the group belies her argument that she should be permitted to proceed in this action anonymously to protect her privacy. The Court does not doubt that Plaintiff sincerely wishes to maintain her privacy in this matter, given the seriousness and sensitive nature of her allegations. However, her conduct outside of this litigation regarding her own publication of this sensitive information is dispositive as to whether she can demonstrate the "exceptional circumstances" needed to overcome the presumption that parties be named in litigation.

[12] Plaintiff herself appears to concede that someone within the AWDTSG groups shared her post with individuals outside the groups, as she states that "[n]ot only was Plaintiff's privacy effected by dissemination of this screen shot but two other women's identities were provided to the Defendant." ECF No. 39 at 5.

Roberts "is alleged to have threatened Plaintiff's life and safety, and has access to her personal information, the release of which has resulted in continued fear and harassment including by [Roberts], [his] paramour, and the paramour's friends." ECF No. 30-1 at 7. However, Plaintiff presents no cogent argument for how or why permitting her to proceed anonymously will protect her from the risk of retaliation. The identified individuals, including Roberts, are already aware (or likely would be aware) of the present litigation and of Plaintiff's allegations against Roberts. Indeed, Plaintiff alleges these individuals are already harassing her and retaliating against her. As such, Plaintiff has not demonstrated that requiring her to use her real name will itself result in additional retaliation or other risk of harm. Moreover, and significantly, the Court is only holding that Plaintiff must proceed under her own name in this lawsuit. It is not an order for disclosure of personal or sensitive information. Any evidence or testimony of a highly sensitive and personal nature can still be protected from public disclosure, where appropriate, through such mechanisms as confidentiality orders, sealed exhibits, or screened testimony.

As to the third factor, requiring consideration of the age of the protected party, Plaintiff is an adult woman, who was 22 at the time of the alleged incidents. Given her age, this factor weighs against permitting Plaintiff to proceed under a pseudonym or is neutral. *See, e.g.*, *Darden Restaurants*, 2024 WL 2881121, at *3 (D. Md. June 7, 2024) ("Because no minor is a party to this case and the allegations do not involve any minors, the Court finds that the third *James* factor weighs against anonymity."); *K.I. v. Tyagi*, No. 1:23-cv-02383-JRR, 2024 WL 342899, at *2 (D. Md. Jan. 30, 2024) (finding that, where neither party is a minor, "the third factor weighs against permitting Plaintiff to proceed under a pseudonym").

The fourth factor, requiring consideration of whether the action is against a governmental or private party, also weighs against Plaintiff's use of a pseudonym, as no government entity is

involved in this case.  *See, e.g.*, *Doe v. Merten*, 219 F.R.D. 387, 394 (E.D. Va. 2004) ("[C]ourts in general are less likely to grant a plaintiff permission to proceed anonymously when the plaintiff sues a private individual than when the action is against a governmental entity seeking to have a law or regulation declared invalid."); *Doe v. Pittsylvania Cnty.*, 844 F. Supp. 2d 724, 730 (W.D. Va. 2012) ("Actions against the government do no harm to its reputation, whereas suits filed against private parties may damage their good names and result in economic harm.").  "[C]ourts typically find the fourth factor weighs against anonymity where a plaintiff is suing an individual defendant . . ."  *Doe v. Anne Arundel Cnty.*, No. 1:23-cv-03451-JRR, 2024 WL 2053719, at *3 (D. Md. May 8, 2024).  Indeed, Plaintiff appears to concede that the third and fourth factors do not weigh in her favor.  *See* ECF No. 30-1 at 7 (stating "Plaintiff is over 21 and the action is against a company and an individual").

Finally, the fifth factor weighs against Plaintiff's use of a pseudonym.  This factor considers whether Plaintiff's request to proceed pseudonymously is unfair to the opposing party.  Roberts argues, and the Court agrees, that he could suffer prejudice for multiple reasons.  ECF No. 32.  First, Roberts contends that because liability has not been established in this case—and "Roberts vehemently denies liability"—there is some risk that a jury may view the decision to let Plaintiff proceed anonymously to suggest that her claims are valid.  *Id*. at 3.  The Fourth Circuit has recognized this as a source of "potential unfairness when a plaintiff seeks to proceed anonymously while making allegations against a known defendant."  *Sidar*, 93 F.4th at 249.  Additionally, Roberts contends Plaintiff should not be permitted to "use anonymity as a shield to launch defamatory charges without shame or liability" or to "'have [her] cake and eat it to' by gaining the ability to remain anonymous" if she loses and retaining power to reveal her identify if she wins.  ECF No. 32 at 3.  Again, the Fourth Circuit has recognized both of these concerns as

potential unfairness weighing against anonymity.  *Sidar*, 93 F.4th at 249; *see also Doe v. N. Carolina Cent. Univ.*, No. 1:98-cv-01095, 1999 WL 1939248, at *5 (M.D.N.C. Apr. 15, 1999) ("Defendants could be prejudiced before the jury if Plaintiff asserts claims for pain and suffering based on her embarrassment and shame, and the Court then reinforces those claims by allowing Plaintiff to proceed under a pseudonym.").  While, given the nature of Plaintiff's allegations (sexual assault), Robert's concerns may not have been sufficient to overcome Plaintiff's request for anonymity had she not herself undermined her request to maintain her privacy; *see supra* discussion pp. 7–17; *see also Doe*, 649 F. Supp. 3d at 139; the Court finds that Plaintiff should not be permitted to make allegations and accusations using her name against Roberts in a public forum while at the same time being allowed to proceed in a court action against him seeking damages while hiding behind the protections of anonymity.

## CONCLUSION

The Court is mindful of the unique circumstances this case presents.  Indeed, the Court has not found a single case directly on point with the issues presented herein.  But the law applicable to evaluating pseudonymous litigation requires the Court to evaluate such cases on the facts and circumstances unique to each case, balancing the interests of the parties and the public.  On the unique facts of this case and in consideration of the *James* factors, the Court finds that Plaintiff should not be permitted to proceed in this action using a pseudonym.

Therefore, Roberts' motion is GRANTED and Plaintiff's motion is DENIED.  Within seven (7) days from the date that this Order is entered, Plaintiff must file an Amended Complaint identifying herself by name as the Plaintiff in this case.

IT IS SO ORDERED.

<u>s/Bristow Marchant</u>
United States Magistrate Judge

August 5, 2024
Greenville, South Carolina